# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
### No. 22-1917V

|  |  |
|---|---|
| CHELSEA HUGHES,<br><br>                    Petitioner,<br><br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                    Respondent. | Chief Special Master Corcoran<br><br><br>Filed: August 25, 2025 |

*Kirk Tripp William Otto, III, Rawls Law Group, Richmond, VA, for Petitioner.*

*Katherine Edwards, U.S. Department of Justice, Washington, DC, for Respondent.*

## FACT RULING DISMISSING TABLE CLAIM AND TRANSFER ORDER[1]

On December 29, 2022, Chelsea Hughes filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"), alleging that she suffered a shoulder injury related to vaccine administration ("SIRVA") – a Table injury – as a result of an influenza ("flu") vaccine administered to her on January 22, 2020.[3] Pet. at 1, ECF No. 1. The case was assigned to the Special Processing Unit of the Office of Special Masters (the "SPU").

For the reasons discussed below, I find it more likely than not that Petitioner's injury was not limited to the shoulder in which the vaccine was administered. Petitioner's Table

---

[1] Because this Ruling contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

[3] Petitioner alternatively alleges that her subject flu vaccination was the cause-in-fact of her injury.

claim is therefore **DISMISSED**, and the matter transferred out of SPU for resolution of a non-Table claim.

## I.    Relevant Procedural History

Respondent filed his Rule 4(c) Report defending this case on April 15, 2024. ECF No. 23. In it, he made a number of arguments[4] against Petitioner's ability to establish a Table SIRVA claim, including that her pain and diminished range of motion ("ROM") was not limited to the shoulder in which the subject vaccination was administered. *Id.* at 10 (internal citations omitted).

After a review of the record and Respondent's arguments, I issued an Order to Show Cause, outlining the critical issues related to Petitioner's ability to satisfy a Table SIRVA claim (specifically the third QAI criterion for a Table SIRVA) and affording her an opportunity to submit any additional evidence to remedy these main deficiencies in the record. ECF No. 24. But I warned Petitioner that my ultimate analysis would start with the medical record documentation, supplemented by declarations or affidavits. *Id.* at 5.

In response, Petitioner submitted a status report stating that she "does not have additional evidence to support her claim that she suffered a Table SIRVA." ECF No. 26. As a result, Petitioner requested this matter be removed from SPU so she may determine (with expert support) whether her subject vaccination caused "an off-Table SIRVA, the alternative injury of some form of neuropathy manifested by her [p]aresthesia, or significantly aggravated her existing neuropathy manifested by her [p]aresthesia and/or Sickle Cell Disease, which had previously led to an instance of [p]aresthesia." *See id.* Respondent requested Petitioner's SIRVA Table claim be dismissed and the new causation-in-fact claim be placed on a litigation track. ECF No. 27. The Table claim is thus now ripe for consideration.

## II.    Relevant Medical Evidence

I have reviewed all of the medical records and evidence filed to date. Only such information related to whether Petitioner's pain was limited to the arm in which the subject

---

[4] While not addressed in this Ruling, Respondent relatedly argued that Petitioner suffered from another condition or abnormality that could explain her post vaccination shoulder symptoms better than the subject vaccination. ECF No. 23 at 11 (internal citations omitted). Respondent also argued Petitioner cannot demonstrate that the onset of her symptoms occurred within 48-hours of her receipt of the subject vaccination or that she suffered from reduced range of motion consistent with a Table SIRVA. *Id.* at 8, 10. More so, he contended that Petitioner has not provided evidence to establish causation-in-fact and/or significant aggravation claims. *See id.* at 12-14. Finally, he asserted that Petitioner cannot establish the Act's six-month severity requirement. *Id.* at 15-17. Although this is a threshold requirement, Respondent inexplicably addressed it last in his Rule 4(c) Report. *See id.*

vaccination was administered will be discussed herein, though other facts may be included as necessary.

Petitioner received the subject vaccination in her left deltoid on January 22, 2020, while at a visit at her primary care provider ("PCP")'s office. Ex. 3 at 76.

On March 9, 2020, Petitioner saw her PCP with a chief complaint of "[l]eft arm/finger numbness." Ex. 3 at 68. During a physical examination, Petitioner reported specifically "[n]umbness/tingling [in the] (hands bilat[erally], and left arm)," plus "[l]eft face paresthesias" which "began after [a] flu shot." *Id.* at 68-69. And she did not mention left *shoulder* complaints during that visit (instead merely reporting left *arm* pain).

Petitioner had a telehealth appointment with her PCP on May 15, 2020. Ex. 3 at 59. Petitioner reported "left shoulder pain after flu shot 1/22/20" and "[p]aresthesias left left [sic] 1, 2 fingers." *Id.* at 60. Under the "physical examination" section (though performed via video), the PCP noted tenderness of the left rotator cuff and "paresthesias left 1, 2 finger [sic]." *Id.* The PCP assessed Petitioner with pain in the left shoulder, pain in the left shoulder joint, and left hand paresthesias – for which an orthopedic consult and carpal tunnel splint were recommended. *Id.* at 60-61.

Similarly, during Petitioner's PCP follow-up visit on June 15, 2020, she reported "[l]eft shoulder pain [and] paresthesias since 2/20," specifically in the bilateral upper extremities and left hand. Ex. 3 at 56. She also endorsed "[n]umbness [and] tingling [in the] hand[,]" pain with raising the left shoulder, and "[p]aresthesias [that] extend[ed] to [her] neck." *Id.* at 57. A physical examination showed tenderness to the "paracervical area, left" neck. *Id.* The PCP's diagnoses included pain in the left arm, left arm paresthesias, and neck pain. *Id.* at 57-58. Based on these symptoms, Petitioner's PCP recommended consultations for "[carpal tunnel syndrome] vs. cervical radiculopathy (failed carpal tunnel splint)." *Id.* at 58.

Six months later, when Petitioner followed up with her PCP on December 21, 2020, during a "review of systems" Petitioner complained of "persistent pain since flu shot *right* shoulder." Ex. 3 at 53-54 (emphasis added). Despite this entry, a physical examination revealed tenderness of the *left* deltoid. *Id.* at 54 (emphasis added). The visit diagnoses included "left arm paresthesias." *Id.* Petitioner underwent x-rays of the left shoulder *and* left humerus; both were unremarkable. *Id.* at 55, 126-27.

During a February 22, 2021 PCP follow-up visit, Petitioner reported "[p]ersistent left shoulder pain /13 months [status post] flu shot." Ex. 3 at 45. She also noted the pain

"[r]adiates to [the] left hand[,]" she had a "tremor," and "neck pain." *Id.* Petitioner's PCP recommended treatment with both a neurologist and an orthopedist. *Id.* at 46.

Following another six-month gap in care, Petitioner had another telehealth visit with her PCP on August 25, 2021. Ex. 3 at 40. Petitioner complained of left shoulder pain, as well as "[l]eft side face, neck, shoulder, arm weakness[,]" a tremor in the left arm, and a stuttering tongue, "[s]ince flu shot 1/20 left deltoid." *Id.* at 40-41. She noted she was "concerned about sirva [sic]" and also had "left facial numbness x 2 months." *Id.* at 41. A musculoskeletal examination showed tenderness to the left paracervical area (neck), a left hand tremor, and left facial numbness. *Id.* at 42. The PCP ordered Petitioner to undergo MRIs of the cervical spine; Petitioner did so as ordered. *Id.* at 43, 123.

On September 2, 2021, Petitioner had another telehealth visit with her PCP. Ex. 3 at 37. The reason for the visit was listed as "left shoulder pain, left neck pain, [and] left facial pain." *Id.* In addition, she also complained of "left arm pain." *Id.* at 38. A musculoskeletal examination was consistent with "[p]ain [in] left face, neck, shoulder." *Id.* The visit diagnoses included left shoulder pain, left arm pain, and neck pain; the PCP again recommended consultations with neurology and orthopedics. *Id.* at 38-39.

A month later, on October 4, 2021, Petitioner returned to her PCP (via an audio-only telehealth visit). Ex. 3 at 34. She again complained of left shoulder pain, left neck pain, and left facial pain. *Id.* Petitioner also noted a tremor in both hands (left worse than the right), as well as "[p]aresthesias left face, arm." *Id.* at 35. A physical examination (performed via audio) was consistent with left hand and arm weakness, diminished forward flexion in the left shoulder, and a "tremor in the left greater than right hand." *Id.* An October 27, 2021 repeat MRI of the cervical spine was "[s]clerotic" and showed an "indeterminate bone lesion in the C5 vertebral body[,]" which Petitioner's PCP felt "most likely represent[ed] a bone infarct and is related to [Petitioner's pre-existing] sickle cell disease."[5] *Id.* at 121-22.

During a March 23, 2022 PCP follow-up telehealth visit, Petitioner complained of "[l]eft shoulder, left neck pain, left facial pain." Ex. 3 at 28. She also reported left arm pain and tremors. *Id.* at 29. A physical examination showed cervical/neck tenderness, left shoulder tenderness, and paresthesias in the left hand. *Id.* at 29-30. The diagnoses for this visit included left hand and arm paresthesias, atypical facial pain, and an unspecified tremor. *Id.* at 30. The PCP again recommended Petitioner consult with neurology and

---

[5] Petitioner's relevant medical history indeed includes sickle cell disease. Ex. 6 at 4. For instance, in December 2018 (pre vaccination), Petitioner experienced symptoms that were suspected to be related to a sickle cell "crisis" including generalized paresthesias in all limbs, plus right hip pain. Ex. 5 at 204.

orthopedics, undergo another cervical-spine MRI, and noted that "Sirva [sic] forms [were] to be completed." *Id.*

Petitioner's repeat cervical-spine MRI (performed on April 8, 2022), was consistent with the previous findings and showed no significant changes. Ex. 3 at 119. She thereafter returned to her PCP on April 28, 2022, with ongoing complaints of "[n]eck pain, left shoulder pain, paresthesias left." *Id.* at 25. The PCP's assessment of pain in the left arm and shoulder, plus "left arm paresthesias" remained unchanged, and the treater reiterated the proposal to seek care with specialists. *Id.* at 26-27.

On June 3, 2022, Petitioner saw her PCP and reported "[n]eck pain, left shoulder pain, left arm paresthesisa [sic], left facial pain, tremor." Ex. 3 at 22. She also endorsed "[p]ersistent left neck, shoulder pain, left arm paresthesias." *Id.* at 23. Upon physical examination, Petitioner exhibited "minimal" left neck tenderness, diminished ROM, paresthesias in the left arm and hand, and a slight left upper extremity tremor. *Id.* at 23-24. The PCP's assessment of Petitioner remained unchanged and included atypical facial pain, left arm and hand paresthesias, neck pain, left shoulder pain, and an unspecified tremor. *Id.* at 24. The treater noted that Petitioner "request[ed a] summary medical letter and supporting documents to submit to siva [sic]." *Id.* No other medical records related to Petitioner's left shoulder symptoms have been filed.

## III.    Declaration Evidence

In her signed declaration, Petitioner recalls that the day following her subject flu vaccination, she called her PCP to tell him that her "arm was swollen, sore with sharp pains and [she] could not sleep on [her] left side." Ex. 1 at 1. She explains that by her first post-vaccination visit, she "could no longer feel [her] thumb . . . or use [her] thumb to properly pick up things or write, not being able to feel hot or cold water." *Id.* She also notes that her "fingers lock out when [she does] things like holding something, moving or opening a door and making phone calls." *Id.* Petitioner states that her arm "is still swollen[,]" and her "fingers get numb and swollen, [her] fingers lock and arm stings, [her] left arm is limp, sore and shakes." *Id.* at 2. She notes that after her flu vaccination, she "lean[s] to the left and [her] arm shakes with spasms." *Id.*

Petitioner's husband submitted a signed declaration on Petitioner's behalf. Ex. 2. Petitioner's husband recalls that she experienced pain "in her whole arm." *Id.* at 2. According to her husband, Petitioner also had "muscle spasms along with a numbing sensation in her arm." *Id.* No other declaration evidence regarding Petitioner's left shoulder symptoms has been submitted.

5

## IV.    Authority

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). In addition to requirements concerning the vaccination received, the duration and severity of petitioner's injury, and the lack of other award or settlement,[6] a petitioner must establish that she suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination she received. Section 11(c)(1)(C).

Section 11(c)(1) also contains requirements concerning the type of vaccination received and where it was administered, the duration or significance of the injury, and the lack of any other award or settlement. *See* Section 11(c)(1)(A), (B), (D), and (E). With regard to duration, a petitioner must establish that he suffered the residual effects or complications of such illness, disability, injury, or condition for more than six months after the administration of the vaccine. Section 11(c)(1)(D).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of an influenza vaccine. 42 C.F.R. § 100.3(a)(XIV)(B). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests *all* of the following:

> (i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;
>
> (ii) Pain occurs within the specified time frame;
>
> (iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

---

[6] In summary, a petitioner must establish that she received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception; suffered the residual effects of her injury for more than six months, died from her injury, or underwent a surgical intervention during an inpatient hospitalization; and has not filed a civil suit or collected an award or settlement for her injury. *See* § 11(c)(1)(A)(B)(D)(E).

6

(iv) No other condition or abnormality is present that would explain the patient's symptoms (*e.g.* NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, the Federal Circuit has recently "reject[ed] as incorrect the presumption that medical records are always accurate and complete as to all of the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021). Medical professionals may not "accurately record everything" that they observe or may "record only a fraction of all that occurs." *Id.*

Medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery v. Sec'y of Health & Hum. Servs.*, 42 Fed. Cl. 381 at 391 (1998) (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such testimony must also be determined. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id*.

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184, 204 (2013) (citing § 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

## V.    Respondent's Objections and Findings of Fact

Petitioner's SIRVA turns on the third QAI requirement – that a petitioner's pain and reduced range of motion be shown to be "limited to the shoulder in which the intramuscular vaccine was administered." 42 C.F.R. § 100.3(c)(10)(iii).

Respondent argues that Petitioner's pain was not limited to her vaccinated shoulder. ECF No. 23 at 10. And as I noted in my Order to Show Cause (ECF No. 24), there is ample record evidence of pain outside of the vaccinated shoulder. For instance, during a physical examination on March 9, 2020, Petitioner complained of "[l]eft arm/finger numbness," specifically "[n]umbness/tingling [in the] (hands bilat[erally], and left arm)," plus "[l]eft face paresthesias" which "began after [a] flu shot." Ex. 3 at 68-69. And she did not mention left *shoulder* complaints during that visit (instead reporting left *arm* pain).

There is also a record of Petitioner's first post-vaccination visit when left shoulder pain was in fact reported (on May 15, 2020). But at this time, she also complained of "[p]aresthesias [in the] left left [sic] 1, 2 fingers." Ex. 3 at 60. The assessment included pain in the left shoulder *and* left hand paresthesias – for which a carpel tunnel splint was recommended. *Id.* at 61. Similarly, during her follow-up visit on June 15, 2020, she reported "[l]eft shoulder pain [and] paresthesias[,]" specifically in the bilateral upper extremities and left hand. *Id.* at 56. She also endorsed "[n]umbness [and] tingling [in the] hand" and "[p]aresthesias [that] extended to [her] neck." *Id.* at 57. Based on these symptoms, Petitioner's PCP recommended consultations for "[carpal tunnel syndrome] vs. cervical radiculopathy (failed carpal tunnel splint)." *Id.* at 58.

Other entries in Petitioner's medical records also describe symptoms outside of her left shoulder area. *See,* e.g., Ex. 3 at 54 (a December 21, 2020 report of "persistent pain since flu shot [in the] *right* shoulder") (emphasis added); *id.* at 45 (a February 22, 2021 report of "[p]ersistent left shoulder pain . . . [that] radiates to [the] left hand" with a tremor and neck pain); *id.* at 41 (an August 25, 2021 report of "[l]eft side face, neck, shoulder, arm weakness, [t]remor left arm, [and a] [s]tuttering tongue"); *id.* at 37 (a

September 2, 2021 report of "[l]eft shoulder pain, left neck pain, left facial pain"); *id.* at 34 (an October 4, 2021 follow up for left shoulder pain, left neck pain, and left facial pain, plus a bilateral tremor worse in the left hand and paresthesias in the "left face, arm"); *id.* at 30 (a March 23, 2022 note of "[p]ersistent left shoulder, arm, hand paresthesias, , [sic] pain"); *id.* at 22-23 (a June 3, 2022 complaint of "neck pain, left shoulder pain, left arm paresthesias, left facial pain, tremor" diagnosed as atypical facial pain, left arm and hand paresthesias, neck pain, left shoulder pain, and an unspecified tremor). In fact, the entries in her medical records are *consistent* with her declaration, wherein she complains of symptoms including that her "fingers get numb and swollen, [her] fingers lock and [her] arm stings, [her] left arm is limp, sore and shakes." Ex. 1 at 2.

In the Program, special masters have found that claims involving musculoskeletal pain *primarily* occurring in the shoulder are valid under the Table even if there are additional allegations of pain extending to adjacent parts of the body. *K.P. v. Sec'y of Health & Hum. Servs.*, No. 19-65V, 2022 WL 3226776, at *8 (Fed. Cl. Spec. Mstr. May 25, 2022) (holding that "claims involving musculoskeletal pain primarily occurring in the shoulder are valid under the Table even if there are additional allegations of pain extending to adjacent parts of the body"). But the gravamen of the third QAI criterion is intended to "guard against compensating claims involving patterns of pain or reduced [ROM] indicative of a contributing etiology beyond the confines of a musculoskeletal injury to the affected shoulder." *Grossmann v. Sec'y of Health & Hum. Servs.,* No. 18-0013V, 2022 WL 779666, at *15 (Fed. Cl. Spec. Mstr. Feb. 15, 2022).

Thus, special masters balance complaints about shoulder pain, and associated treatment, against evidence that the overall presentation is more systemic. *See,* e.g., *Cross v. Sec'y of Health & Hum. Servs.*, No. 19-1958V, 2023 WL 120783, at *7 (Fed. Cl. Spec. Mstr. Jan. 6, 2023) (finding that "despite the notations of pain extending beyond the shoulder, Petitioner's injury is consistent with the definition of SIRVA and there is not preponderant evidence of another etiology"); *Werning v. Sec'y of Health & Hum. Servs.*, No. 18-0267V, 2020 WL 5051154, at *10 (Fed. Cl. Spec. Mstr. July 27, 2020) (finding that a petitioner satisfied the third SIRVA QAI criterion where there was a complaint of radiating pain, but the petitioner was "diagnosed and treated solely for pain and limited range of motion to her right shoulder").

This record is not reflective of circumstances in which a claimant's treatment evidence contains only "stray notations" of pain extending beyond the shoulder. *See K.P.,* 2022 WL 3226776, at *8. Rather, there is evidence that Petitioner initially complained of (and treatment was proposed for) paresthesias and tremors not specific to or focused on the left shoulder nor specifically *radiating from* the shoulder. Overall, the existing medical record does not consistently reflect a new injury localized to the left shoulder as the

*primary* complaint, that can be isolated from other incidental complaints of pain, paresthesias, and/or tremors elsewhere. As a result, Respondent's localization objections thus wholly undermine Petitioner's Table SIRVA claim.

## Conclusion

At bottom, it is the overall mix of evidence herein that causes me to find Petitioner's Table claim cannot be preponderantly established. Petitioner has not provided preponderant evidence that her pain and limited ROM were limited to the shoulder in which subject vaccination was administered. Nevertheless, a non-Table claim for an alternate injury *could* be viable, and I therefore do not dismiss the case in its entirety at this time.[7] Rather, the claim is transferred out of SPU for resolution of that form of claim.

Accordingly, Petitioner's Table SIRVA claim is **DISMISSED.** Petitioner's non-Table claim, however, may proceed. Because of the factual and medical issues to be decided (requiring amplification via experts), the claim is unlikely to be expeditiously resolved in SPU; and the time for settlement in SPU has also passed. For this reason, transfer is appropriate. **Pursuant to Vaccine Rule 3(d), the above-captioned case is hereby transferred out of SPU and reassigned randomly to a Special Master by the Clerk's Office. Further proceedings will be determined by the assigned Special Master.**

**IT IS SO ORDERED.**

<u>**s/Brian H. Corcoran**</u>
Brian H. Corcoran
Chief Special Master

---

[7] Respondent has also argued that Petitioner cannot establish the Act's threshold statutory severity requirement, as her medical records contain two separate six-month gaps in care (one of which being only four months post vaccination). ECF No. 23 at 15-17. And, despite her PCP's insistence on seeking treatment with specialists during those gaps, Petitioner did not, and she has otherwise provided no explanation for the gaps in care. *See id.* (internal citations omitted). While not a Finding of Fact *per se*, my preliminary view of Respondent's severity objections is that they will likely prove unsuccessful if further contested. For instance, the record does not at any time show that Petitioner's left shoulder pain had resolved, and, more importantly, upon her return to care on each occasion (post-gap), she related her ongoing shoulder pain to the subject flu vaccination. *See,* e.g., Ex. 3 at 40-41, 53-54, 56-58.

10